IN THE MATTER OF: JANET B. WATSON, GENERAL DELIVERY, WEST JEF-
FERSON, NORTH CAROLINA 28694, S. S. No. 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, SPRAGUE ELEC-
TRIC COMPANY, LANSING, NORTH CAROLINA AND EMPLOYMENT SE-
CURITY COMMISSION OF NORTH CAROLINA, RALEIGH, N. C.

(Filed 8 May 1968.)

**1. Master and Servant § 97—**
 The public policy of the State in enacting the Employment Security Act
is to provide for the compulsory setting aside of unemployment reserves
for the benefit of persons unemployed through no fault of their own. G.S.
96-2.

**2. Statutes § 5—**
 The controlling principle in the interpretation of a statute is that it
must be given the meaning which the legislature intended it to have.

**3. Same—**
 Where the legislature has erected within the statute itself a guide to
its interpretation, that guide must be considered by the courts in the con-
struction of other provisions of the act which, in themselves, are not clear
and explicit.

**4. Master and Servant § 97—**
 The Employment Security Act must be construed so as to provide its
benefits to one who becomes involuntarily unemployed, who is physically
able to work, who is available for work at suitable employment and who,
though actively seeking such employment, cannot find it through no fault
of his own. G.S. 96-13; G.S. 96-14.

**5. Master and Servant § 105—**
 The term "suitable work", G.S. 96-14(3), relates primarily to the skills
required, the compensation to be paid, and the risks incurred by the em-
ployee by reason of either the nature of the work to be done, or the en-
vironment or time in which it is to be done.

**6. Same—**
 Although the job rejected by claimant for unemployment insurance bene-
fits constituted "suitable work," her rejection of it does not necessarily dis-
qualify her for benefits unless the rejection was "without good cause."

**7. Statutes § 5—**
 Words of a statute are not to be deemed merely redundant if they can
reasonably be construed so as to add something to the statute which is
in harmony with its purpose.

**8. Master and Servant § 105—**
 The "good cause" for rejection of tendered employment need not be a
cause attributable to the employer. G.S. 96-14(3).

**9. Statutes § 5—**
 Words in a statute are to be given their natural and ordinary meaning
unless the context requires a different construction.

**10. Master and Servant § 105—**
 Where the mother of a nine-year-old child is involuntarily discharged

from her job on the first shift in an electrical plant, and is thereafter tendered like work on the second shift, which she refused solely on the ground that she is unable to obtain adequate care and supervision for her child during the hours of the second shift, such rejection of the job was for good cause within the meaning of G.S. 96-14(3) and did not disqualify her for benefits otherwise payable under the Employment Security Act.

**11. Same—**

A worker in an electrical plant who is involuntarily discharged from her job on the first shift and who thereafter rejects the tender of a job on the second shift solely upon the ground that she is unable to obtain adequate care and supervision for her nine-year-old child during the hours of the second shift *is held* available for work within the purview of G.S. 96-13.

**12. Same—**

Personal circumstances which at all hours preclude a claimant from accepting employment make such person ineligible for the benefits of the Employment Security Act for the reason that such person is not available for work, but personal circumstances which leave an employee free to return to work during the hours of her former employment, which are the hours most people in her line of work are employed in the community, do not render her unavailable for work merely because they preclude her from accepting employment at an entirely different period of the day.

**13. Master and Servant § 97; Parent and Child § 1—**

Society, as well as the parent, has a very material interest in the supervision and care of children after their release from school at the end of the day, and, accordingly, the Employment Security Act should not be construed so as to deny its benefits to a mother who rejected a tender of employment on the sole ground that she is unable to obtain adequate care for. her child during the working hours of the proffered employment.

APPEAL by Employment Security Commission of North Carolina from *Copeland, S.J.*, at the September 1967 Civil Session of ASHE.

Janet B. Watson, formerly employed by Sprague Electric Company, filed her claim with the Employment Security Commission for unemployment insurance benefits on account of involuntary unemployment commencing 17 March 1967. The claim was heard by a claims deputy of the commission, who determined that Mrs. Watson was eligible for such benefits from 17 March through 27 April 1967, but not thereafter. Mrs. Watson appealed from this determination. The appeals deputy determined that she was eligible for benefits to and including 1 June 1967. From this ruling the employer appealed to the chairman of the commission, who affirmed the decision of the appeals deputy. The employer thereupon appealed to the superior court, which reversed the decision of the chairman and remanded the proceeding to the commission for the entry of an order in accordance with the court's conclusion that Mrs. Watson was not entitled to benefits on and after 28 April 1967.

The facts, which are not in dispute, were found by the chairman of the commission to be as follows:

"1. The claimant filed a claim for unemployment insurance benefits on March 17, 1967, and had continued the same weekly up until the date of the hearing before the Appeals Deputy on June 9, 1967.

"2. The claimant was last employed by Sprague Electric Company of Lansing, North Carolina, and was laid off by such employer on March 16, 1967, by reason of no work available. The claimant had worked eleven years for this employer on the first shift as a bench assembler. On May 1, 1967, Sprague Electric Company offered the claimant a job doing identical work she had done prior to her layoff and at the same rate of pay but on the second shift. The claimant refused the offer of work because she is the mother of a nine-year-old son, and her husband works out of town during the week and she cannot make arrangements and has no one to care for her son during the hours of the second shift.

"3. In the labor market area where the claimant resides, approximately seventy per cent of the job opportunities for one of the claimant's vocation and abilities are found during the daytime hours. About thirty per cent of such job opportunities occur on the second shift.

"4. During the period the claimant has filed claims for benefits she has been physically able to work and has made an active search for work with potential employers in the area."

It further appears from the record that the claimant accepted employment with another employer as soon as work on the first shift became available to her.

*R. B. Billings, D. G. Ball and H. D. Harrison, Jr., for appellant, Employment Security Commission.*
*Maupin, Taylor & Ellis for appellee, Sprague Electric Company.*

LAKE, J. The sole question for determination on this appeal is this: When the mother of a nine year old child is laid off from her job on the first shift, without fault on her part, and is thereafter tendered like work on the second shift, which she refuses solely for the reason that she is unable to obtain adequate care and supervision for her child during the work hours of the second shift, is

she disqualified for unemployment insurance benefits? We conclude that the answer is, No.

The public policy of this State which gave rise to the Employment Security Act is thus declared in G.S. 96-2:

> "As a guide to the interpretation and application of this chapter, the public policy of this State is declared to be as follows: Economic insecurity due to unemployment is a serious menace to the health, morals, and welfare of the people of this State. *Involuntary unemployment* is therefore a subject of general interest and concern which requires appropriate action by the legislature to prevent its spread and lighten its burden which now so often falls with crushing force upon the unemployed worker and his family. * * * The legislature, therefore, declares that in its considered judgment the public good and the general welfare of the citizens of this State require the enactment of this measure, under the police powers of the State, for the compulsory setting aside of unemployment reserves to be used for the benefit of persons *unemployed through no fault of their own*." (Emphasis added.)

It is elementary that the controlling principle in the interpretation of a statute is that it must be given the meaning which the Legislature intended it to have. *Highway Commission v. Hemphill*, 269 N.C. 535, 153 S.E. 2d 22; *Sale v. Johnson, Commissioner of Revenue*, 258 N.C. 749, 129 S.E. 2d 465; *Greensboro v. Smith*, 241 N.C. 363, 85 S.E. 2d 292; *Guano Co. v. Walston*, 187 N.C. 667, 122 S.E. 663. Thus, when the Legislature has erected within the statute, itself, a guide to its interpretation, that guide must be considered by the courts in the construction of other provisions of the act which, in themselves, are not clear and explicit. 82 C.J.S., Statutes, § 315. We, therefore, must interpret the provisions of the Employment Security Act, setting forth the prerequisites to eligibility for its benefits and circumstances which will disqualify one from receiving its benefits, to the extent that interpretation is required, in the light of the foregoing declaration by the Legislature of the policy to be accomplished by the act.

G.S. 96-13 prescribes the conditions for eligibility to benefits under the act. The portion pertinent to the present appeal is as follows:

> "An unemployed individual shall be eligible to receive benefits with respect to any week only if the Commission finds that * * *
>
> "(3) He is able to work, and is available for work: Provided that no individual shall be deemed available for work unless he

establishes to the satisfaction of the Commission that he is actively seeking work  *  *  *."

G.S. 96-14 prescribes certain conditions which disqualify a claimant for benefits under the act. The pertinent portion of this section of the act is:

> "An individual shall be disqualified for benefits:  *  *  *
>
> "(3)    For not less than four, nor more than twelve consecutive weeks of unemployment  *  *  *  if it is determined by the Commission that such individual has failed *without good cause*  *  *  *  (ii)  to accept suitable work when offered him;  *  *  *
>
> "In determining whether or not any work is suitable for an individual, the Commission shall consider the degree of risk involved to his health, safety, and morals, his physical fitness and prior training, his experience and prior earnings, his length of unemployment and prospects for securing local work in his customary occupation, and the distance of the available work from his residence.  *  *  *" (Emphasis added.)

It is apparent that the Employment Security Act was not designed to provide the payment of benefits to a person who is physically unable to work or who, for any other personal reason, would at no time be in a position to accept any employment if it were tendered to him, however capable and industrious such person may be. It is equally clear that the act was not designed to provide payment of benefits to a person who is able to work but who prefers compensated idleness to work for higher wages. The act does not provide health insurance to the industrious worker stricken by accident or disease. It does not provide compensation to the industrious worker whose family responsibilities are such as to preclude the acceptance of any and all employment. It does not provide for payment of benefits to one who, through fear that he may be overtaken by honest work, erects around himself all manner of conditions precedent to his acceptance of employment so as to preclude any possibility of his contact with a job. On the other hand, the statute must be construed so as to provide its benefits to one who becomes involuntarily unemployed, who is physically able to work, who is available for work at suitable employment and who, though actively seeking such employment, cannot find it through no fault of his own.

The terms "able to work", "available for work" and "suitable employment" are not precise terms capable of application with mathematical precision. They are somewhat akin to the terms "reasonable man" and "due care," which continue to defy the best efforts of both the lexicographer and the professor of torts to define them satisfac-

torily and yet are applied with considerable success each day by juries through the application of common sense and experience. A large measure of administrative discretion must be granted to the Employment Security Commission in the application of these terms in the statute to specific cases. The key words in the guidance of this exercise of discretion are "through no fault of his own" and "without good cause." See, *In Re Abernathy*, 259 N.C. 190, 130 S.E. 2d 292, app. dism., 375 U.S. 161, 84 S. Ct. 274, 11 L. Ed. 2d 261. Admittedly these guiding phrases, themselves, are not precise terms. They do, however, focus attention back upon the legislative purpose to provide temporary income to one "involuntarily unemployed" who is physically able to work and desirous of work.

The statute, G.S. 96-14(3), prescribes certain matters which the commission "shall consider" in determining whether work tendered to a given individual is "suitable" for that individual. This statutory catalogue of matters to be considered is not all inclusive. Other circumstances may make a job, which is "suitable" for one person, "unsuitable" for another. Obviously, the statutory catalogue makes the test of suitability of a job dependent, in some measure, upon the personal qualifications and circumstances of the individual claimant. This is not to say that, to be "suitable," a job must be free from all inconvenience and completely satisfying to the claimant. Few, if any, find such work as that. Without attempting to define "suitable work," we think it clear that this term relates primarily to the skills required, the compensation to be paid, and the risks incurred by the employee by reason of either the nature of the work to be done, or the environment or time in which it is to be done.

In the present case, the job rejected by the claimant involved the same kind of work she had previously done in the same plant at the same wage. There is no suggestion that she, personally, would not have been as safe while at work, or while going to and from work, on the second shift as she had been on the first shift. We conclude, therefore, that the job she rejected was "suitable work." Nevertheless, her rejection of it does not necessarily disqualify her to receive benefits under the act to which she would otherwise be entitled. The statutory disqualification arises only if her rejection of suitable work offered her was "without good cause."

It is a well settled principle of statutory construction that words of a statute are not to be deemed merely redundant if they can reasonably be construed so as to add something to the statute which is in harmony with its purpose. *Jones v. Board of Education*, 185 N.C. 303, 117 S.E. 37. By the express language of the statute, the skills, experience, earning ability, health and safety of the employee on

IN RE WATSON.

and around the job relate to the question of whether the tendered job is "suitable work." Consequently, to determine what is "good cause" for rejecting suitable work, other matters must be taken into account.

In G.S. 96-14(1) it is provided that one is disqualified from receiving benefits under the act if he left work voluntarily "without good cause attributable to the employer." The disqualification imposed in G.S. 96-14(3) for failure to accept suitable work "without good cause" does not carry the qualifying phrase "attributable to the employer." It cannot be presumed that the omission of these qualifying words was an oversight on the part of the Legislature. Thus, the "good cause" for rejection of tendered employment need not be a cause attributable to the employer.

Words in a statute are to be given their natural, ordinary meaning, unless the context requires a different construction. *Byrd v. Piedmont Aviation, Inc.,* 256 N.C. 684, 124 S.E. 2d 880. In the light of the legislative declaration of policy contained in the Employment Security Act, we conclude that an employee, having been separated from his job through no fault of his own, rejects other tendered employment for "good cause" when his reason for such rejection would be deemed by reasonable men and women valid and not indicative of an unwillingness to work. It is difficult to imagine a better cause for rejection of employment in the late afternoon and evening than the responsibility of a mother for the care of a nine year old child who would otherwise be without supervision from the end of the school day until approximately midnight. The alarming increase in juvenile delinquency in recent years has made it abundantly clear that society, as well as the parent, has a very material interest in the supervision and care of children after their release from school. We, therefore, hold that the claimant's rejection of the job tendered to her for second shift work was for good cause, within the meaning of G.S. 96-14(3), and did not disqualify her for benefits otherwise payable under the Employment Security Act.

The remaining question is whether the claimant was "available for work," within the meaning of G.S. 96-13, in view of her inability to accept employment on the second shift. This Court held that a Seventh Day Adventist is available for work, within the meaning of this statute, notwithstanding the circumstance that her religious faith led her to impose as a condition of her employment that she not be required to work between sundown on Friday and sundown on Saturday, and thus precluded her employment on either the second or the third shift. *In Re Miller,* 243 N.C. 509, 91 S.E. 2d 241.

In the *Miller* case, the employee had been employed on the third

shift prior to her conversion to the faith of the Seventh Day Adventist denomination. She was discharged from that employment because she remained absent from work on Friday night, pursuant to her religious beliefs following her conversion to that faith. In the area where she resided, ninety-five per cent of all job openings for persons engaged in the work for which she was qualified were openings for third shift work. The Employment Security Commission concluded that the claimant had made herself unavailable for work and denied her benefits under the act. This Court reversed that determination, saying through Johnson, J.:

> "If the phrase, 'available for work,' as used in G.S. 96-13, is susceptible of the interpretation applied by the Commission, the logic of the thing would seem to be that the phrase may be applied so as to disqualify, or render ineligible for benefits, the vast majority of people who are not available for work on Sunday *or who do not work on any night*. If this be so, then the rationale of the statute would seem to be that in order to be eligible for benefits a claimant must be 'available for work' at any and all times, night and day, Sunday and week days alike." (Emphasis added.)

Here, as in the *Miller* case, we do not undertake to formulate an all-embracing rule for determining what constitutes being "available for work." Here, as there, we reject the contention that to be eligible for benefits under the act one must be available for work at any and all times. If, as we there held, one is not rendered unavailable for work by her unwillingness, by reason of moral convictions, to accept work during the period within which ninety five per cent of the jobs in her community are to be found, even though her moral standards are not accepted by the majority in the community, it surely follows that one, who actively seeks employment during the hours in which seventy per cent of the available jobs in the community in her line of work are normally found, is not rendered unavailable for work by her refusal of employment during other hours, which would require her to leave her nine year old child unattended and unsupervised.

It is abundantly clear from this record that this claimant was unemployed "through no fault of her own," that she imposed no fictitious or unreasonable conditions upon her reemployment by the same or a different employer, that she actively sought reemployment at the same type of work, in the same community and on the same shift as that upon which she was previously employed. To hold that she was unavailable for employment would give to the Employment

Security Act a harsh construction which would defeat the purpose of the Legislature in its enactment. Personal circumstances which at all hours preclude a claimant from accepting employment make such person ineligible for the benefits of the Employment Security Act for the reason that such person is not available for work, but personal circumstances which leave an employee free to return to work during the hours of her former employment, which are the hours during which most people in her line of work are employed in the community, do not render her unavailable for work merely because they preclude her from accepting employment at an entirely different period of the day. See: Freeman, Able to Work and Available for Work, 55 Yale Law Journal 123, 130; Menard, Refusal of Suitable Work, 55 Yale Law Journal 134.

The appellee-employer, in its brief, has directed our attention to numerous decisions from other jurisdictions denying claims for benefits under the statutes similar to, though not always identical with, the North Carolina Employment Security Act. In many of those cases the factual situation was substantially different from that now before us. In others, despite our great respect for the courts rendering the decisions, we do not find the reasoning persuasive. Since the factual situations in all those cases differ from each other and the reasoning of the respective courts also varies, it is not practicable, within the limits of this opinion, to discuss all of them in detail. We have, however, given careful consideration to each of these decisions from our sister states and shall refer briefly to those most frequently cited in other opinions.

In *Kut v. Albers Super Markets*, 146 Oh. St. 522, 66 N.E. 2d 643, a Seventh Day Adventist was denied unemployment compensation benefits on the ground that he was not "available for work" due to his unwillingness to work on Saturday. There was the further circumstance that he had also rejected the employer's offer to permit him to work on Sunday in lieu of Saturday. Furthermore, this was not a case in which the employee was laid off his old job and refused to take a new one, but was a case of the employee leaving his old job because he was unwilling to work during its customary hours, a circumstance discussed below. The Ohio court said that since the statute does not designate particular days of the week on which a claimant must be "available for work," the claimant "must be available for work on Saturday if this is required by his usual trade or occupation."

In *Ford Motor Co. v. Appeal Board of Michigan Unemployment Compensation Commission*, 316 Mich. 468, 25 N.W. 2d 586, the court quoted and relied upon the *Kut* case, *supra,* in denying the claim of

a mother who, having been laid off from a second shift job, was unwilling to take work on the first shift because of her desire to prepare breakfast for her two children and get them off to school. The Michigan statute required that the claimant be available for work "full-time," thus differing from the North Carolina act. The court held there was nothing in the Michigan statute to indicate a legislative intent that a claimant might limit his employment to certain hours of the day "where the work he is qualified to perform is not likewise limited."

To the same effect is *LeClerc v. Administrator*, 137 Conn. 438, 78 A 2d 550, denying the claim of a mother of two young children who, having been laid off from her second shift job, was unwilling to accept first shift work due to the necessity of caring for her children at those hours. The Connecticut court said that the claimant "must be exposed unequivocally to the labor market" in order to be "available for work."

In *Swanson v. Minneapolis-Honeywell Regulator Co.*, 240 Minn. 449, 61 N.W. 2d. 526, in denying the claim of a mother of two small children, laid off from a shift starting at 8 a.m. and unwilling to accept employment requiring her to go to work earlier, due to the unavailability at such hour of the day nursery used by her, the court said, "A person is not available for work within the meaning of the statute unless he is accessible or attainable for work when suitable work is offered at such hours as are customary in the type of employment to which he is suited." This was followed in *Thompson v. Schraiber*, 253 Minn. 46, 90 N.W. 2d 915.

The foregoing cases from Ohio, Michigan, Connecticut and Minnesota rest upon an interpretation of "available for work" which was rejected by this Court in the *Miller* case, *supra*. Since that case was decided by this Court, the Supreme Court of the United States has held that the provisions of the First Amendment to the United States Constitution, incorporated into the Fourteenth Amendment by judicial decision, forbid a state to deny unemployment compensation to a Seventh Day Adventist discharged because of her refusal to work on Saturday. *Sherbert v. Verner*, 374 U.S. 398, 83 S. Ct. 1790, 10 L. ed. 2d 965. However, the decision of this Court in the *Miller* case did not rest upon constitutional grounds but upon this Court's construction of "available to work," as used in the North Carolina Employment Security Act. The interpretation there placed by this Court upon this phrase, as used in the North Carolina statute, is that one may be "available for work" notwithstanding his unwillingness, for personal reasons, to work at certain hours or on certain days. We adhere to our decision in the *Miller* case.

Another group of cases relied upon by the appellee-employer is illustrated by *Nurmi v. Vermont Employment Security Board*, 124 Vt. 42, 197 A. 2d 483. There, women previously employed on the night shift were laid off when that shift was discontinued. They were denied benefits under the Vermont statute because the necessity for caring for their children during the day precluded them from accepting daytime employment. The court said that such domestic situation was not "good cause" for rejecting the proposed new employment and, consequently, the claimants were not "available for work." The Vermont statute, like ours, disqualifies a claimant who quit his last job "voluntarily without good cause attributable to such employing unit." It also, like our statute, provides that a claimant would be disqualified for benefits if he refused to accept suitable work without "good cause." The court said that, by implication, "good cause" for rejecting proposed new employment must be a cause connected with the proposed work and, therefore, did not include domestic duties. Language to the same effect is found in *Buchko v. Unemployment Compensation Board of Review*, 196 Pa. Super. 559, 175 A. 2d 914, and *Watson v. Unemployment Compensation Board of Review*, 176 Pa. Super. 490, 109 A. 2d 215, although these cases actually turned upon a definition of "good cause" in the Pennsylvania act, which is not contained in the North Carolina statute and which expressly states that domestic obligations are not "good cause" wherever that phrase is used in the Pennsylvania act.

We are unable to concur in the view thus expressed by the Vermont and Pennsylvania courts. When, in two paragraphs of the same section of a statute, the legislature provides for disqualification of a claimant who leaves his old job without "good cause attributable to his employer" and for disqualification of one who rejects new work without "good cause," we think it evident that the legislature, for some reason satisfactory to it, intended to make the difference between the two situations which its language expresses. That is, a factual situation which may be "good cause" for rejecting a proposed new employment need not be connected with the proposed work itself. The wisdom of such distinction is for the legislature, our authority being merely to determine the meaning of the words it used.

In view of the above quoted legislative declaration of its purpose in the passage of this statute, incorporated in the statute "as a guide to the interpretation and application" of it, we think it clear that sections of the act imposing disqualifications for its benefits should be strictly construed in favor of the claimant and should not be enlarged by implication or by adding to one such disqualifying provision words found only in another.

We are also unable to concur in the conclusion of the Vermont court that one who, without "good cause," rejects a proposed new employment thereby establishes his unavailability for work. One who is not "available for work" is not eligible for benefits under this act so long as the unavailability continues, irrespective of whether the lack of availability is with or without "good cause." Rejection of a tendered employment without "good cause" disqualifies for benefits one who is "available for work," but only to the extent and for the period prescribed by the disqualifying section of the statute. The two provisions of the act are separate and distinct. The decision of this Court in the *Miller* case, *supra,* establishes that the requirement in the North Carolina act that the claimant be "available for work" does not mean that he must be willing and ready to accept work for which he is qualified, at whatever hour and on whatever day such work may be offered to him.

Another group of cases cited by the appellee-employer are distinguishable in that they dealt with claimants who had voluntarily quit their former job. In such situation the North Carolina Employment Security Act expressly provides disqualification for benefits unless the claimant left the former employment for "good cause attributable to the employer." G.S. 96-14(1). The statute construed in those cases contained a like provision. Obviously, domestic duties of the claimant would not qualify as "good cause attributable to the employer." In this group of cases are: *Huiet v. Schwob Mfg. Co.,* 196 Ga. 855, 27 S.E. 2d 743; *Hainzer v. Unemployment Compensation Board of Review,* 202 Pa. Super. 172, 195 A. 2d 842; *Stone Mfg. Co. v. South Carolina Employment Security Commission,* 219 S.C. 239, 64 S.E. 2d 644; *Judson Mills v. South Carolina Unemployment Compensation Commission,* 204 S.C. 37, 28 S.E. 2d 535; *Moore v. Commissioner of Employment Security,* 197 Tenn. 444, 273 S.W. 2d 703.

In *Unemployment Compensation Commission v. Tomko,* 192 Va. 463, 65 S.E. 2d 524, the court denied benefits under the Virginia statute to coal miners who, pursuant to a union directive, refused to work at their regular jobs more than three days a week pending negotiations between the union and the mine operators for a new contract, the mine operators offering employment five days a week. The Virginia court held that the claimants were not "available for work" because they had attached to their willingness to work restrictions which were not usual and customary in their occupation but which were desired by them because of their particular needs or circumstances. There is no similarity between that situation and the one now before us.

In other cases cited in the appellee-employer's brief, the domestic duties or physical condition of the claimant excluded her from all possibility of work during the only hours or at the only places where work she was qualified to do was available. *Valenti v. Board of Review of Unemployment Compensation Commission,* 4 N.J. 287, 72 A. 2d 516; *Salavarria v. Murphy,* 266 App. Div. 933, 43 N.Y.S. 2d 899; *Schubauer v. Unemployment Compensation Board of Review,* 197 Pa. Super. 600, 179 A. 2d 661. Obviously, in such cases the claimant is not "available for work," for, as the New Hampshire court has said, "Where the claimant attaches such restrictions on the time or type of work he will accept that there is no market for his services as offered, he is not considered available." *Goings v. Riley,* 98 N.H. 93, 95 A. 2d 137. That is not the situation where, as here, the claimant, after working many years on the first shift, was laid off through neither fault nor choice of her own, and actively seeks employment on the same shift, which is the shift on which 70 per cent of the jobs she is qualified to do are held in her community.

The conclusions of the superior court that the claimant is not entitled to benefits under the Employment Security Act during the period in question in this proceeding, that the claimant was not available for work, and that she did not have good cause for refusing the offer of second shift employment were erroneous. The judgment of the superior court is, therefore, reversed and this matter is remanded to the superior court with direction to enter a judgment affirming the order of the Employment Security Commission.

Error and remanded.